# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01651-COA

COURTNEY L. RAINEY                                              APPELLANT

v.

STATE OF MISSISSIPPI                                            APPELLEE

DATE OF JUDGMENT:              09/24/2019
TRIAL JUDGE:                  HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:    MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       EUGENE CARLOS TANNER III
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:            JOHN K. BRAMLETT
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  REVERSED AND RENDERED - 03/16/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     Courtney Rainey appeals from her July 2019 jury conviction of felony witness intimidation and subsequent sentence of fifteen years in the custody of the Mississippi Department of Corrections with three years suspended and five years of supervised probation or post-release supervision.  Rainey was originally indicted on two counts—Count I (voter fraud) for influencing the vote of Emma Ousley when Rainey allegedly registered Ousley to vote and bought her beer in exchange; and Count II (witness intimidation) for allegedly encouraging Ousley to provide false information when the District Attorney's office began

1

investigating voter fraud in Canton municipal elections. The jury could not reach a verdict on Count I but found Rainey guilty of Count II. On appeal, Rainey argues that there was insufficient evidence to support the jury's verdict on Count II, that the witness intimidation statute, as applied in this case, deprived her of her constitutional right to free speech, and that the circuit court's sentence was grossly disproportional and violated Rainey's Eighth Amendment right to be free of cruel and unusual punishment. After reviewing the record, the arguments of counsel, and relevant precedent, we reverse and render, finding the evidence insufficient to support the jury's verdict.

**Facts**

¶2.     In March 2017, Courtney Rainey, a Canton, Mississippi, resident and city employee, was actively supporting a candidate in the upcoming Canton municipal election. She also sought to register voters, and in this effort, Rainey encountered Emma Ousley at Ousley's apartment. Ousley, her boyfriend, Marvin Cain, and a neighbor named Red were on the porch drinking beer when Rainey met them. Rainey asked if everyone was registered to vote, and Cain said he was not. So Rainey helped both him and Ousley fill out the voter registration forms.[1] She asked each of them the questions on the forms, allowed them to read over their answers, and they signed them. Thereafter, Rainey said that she would buy them a round of beer and gave $10 to Red who went to purchase it.

---

[1] Even though Ousley had previously registered and voted in other elections, she had moved.

2

¶3. As the election neared, Rainey called Ousley and offered to take her to City Hall to vote by absentee ballot. Ousley agreed, went with Rainey, and voted. After she voted, Ousley testified that Rainey gave her $10 to get something to eat.

¶4. In early 2018, the Madison County District Attorney's office began an investigation into potential voter fraud in the May 2 and May 16, 2017 Canton municipal primaries and the June 2017 general election. To assist its in-house investigators, Carroll Phelps and Samuel Goodman, the District Attorney contracted with an independent investigator, Max Mayes.

¶5. Mayes and Phelps contacted Ousley in June 2018 and questioned her about Rainey. Ousley told them about Rainey's voter registration visit. A statement that Mayes wrote and Ousley signed that day revealed that Rainey had come to the apartments, called out for anyone who wanted to vote, and asked if anyone wanted to make some money. The statement also revealed that Rainey had given both Marvin and Ousley ten dollars each for beer after she registered them.

¶6. It is unknown how Rainey found out about the investigation, but sometime after it had begun, Rainey visited Ousley again at her apartment. Rainey asked Ousley about what Ousley had told the investigators. Rainey told Ousley to tell the investigators the truth of what happened between them.

¶7. On October 17, 2018, a Madison County, Mississippi grand jury returned an indictment against Rainey concerning her interactions with Ousley. Rainey was charged with

3

violating Mississippi Code Annotated section 23-15-753 (Rev. 2018) by attempting to "procure or influence the vote of Emma Ousley by the payment of money in exchange for [sic] his vote" (Count I-Voter Fraud). Rainey was also charged with attempting "to solicit, encourage or request a witness to provide false information intended to defeat or defend against an existing criminal charge . . . to wit: Emma Ousley (a witness to a crime purportedly committed by the Defendant) at her home . . . by requesting Ms. Ousley to change her story that she provided to investigators so the defendant would not get in trouble," in violation of Mississippi Code Annotated section 97-9-113(d) (Rev. 2020) (Count II-Witness Intimidation).

¶8.    A week before the start of the jury trial, Ousley admitted to the prosecutor that parts of the statement that Mayes wrote for her were untrue and that she had said these things because she was scared and nervous because the "police" had come to her house. Apparently either Mayes or Phelps had a gun and a badge when they met with her.

¶9.    Trial began on July 30, 2019.[2] Ousley testified about Rainey's visit to her apartment and the events surrounding her registration and voting which are related above. Ousley then testified that Rainey came back several months later after the investigation into the election had begun. Ousley said that Rainey specifically asked if Ousley had told the investigators about the money Rainey had given her. At trial, Ousley described this meeting as follows:

---

[2] A few days before trial started, a shooting occurred at Ousley's apartment building. The State informed the court that it had no information that the shooting was connected to Rainey, and no mention of it was made to the jury.

Q. And what did she say when she approached you that time?

A. She came up to my house, she was asking me a lot of questions. I told her I was going to tell the truth.

Q. What were those questions about?

A. Did she give me ten dollars, or what did I say, Twin, is it true. I told her, I said I was just going to tell the truth. I walked her down to the car, and I told her, I said, I'm just going to tell the truth. And she got in her car and went home, or wherever she went. I don't know where she went.

Ousley said that Rainey was not attempting to intimidate her:

Q. . . . What did she tell you [?]

A. She didn't tell me to say anything.

Q. She told you to tell them folks the truth?

A. Yes.

Q. So her intimidating you was to tell you to tell the police the truth?

A. Yes. And it wasn't no intimidation. She didn't intimidate me. She didn't intimidate me at all.

Q. And you don't get the feeling that she was trying –

A . -- no, she didn't intimidate me. I'm not going to -- see, you say like intimidate me. It was no kind of intimidation at all.

Q. Okay. So she was just telling you to tell folks the truth?

A. Yeah, just tell the truth.

¶10. If Ousley felt uneasy with anyone, it appears to have been Mayes because Ousley testified that Mayes and Phelps scared her:

5

A. I didn't know, I really don't even know why I'm up here, to tell you the truth. But when I told that man on that paper what I said, I told him because I was scared of the police. I was scared because they was intimidating me, they was trying to tell me say something happened, which I couldn't say that they was telling me, they was telling me, you know, they was talking to me. As they talked to me, I was telling them and I was nervous. I did lie. I told you that one time before.

Q. But now you said they were trying to intimidate you. Who? Are you saying Phelps –

A. [T]hey didn't really try to intimidate me. They was just asking me a lot of questions all at one time.

Q. Okay, and that was Phelps and Mayes?

A. Yes.

Q. Both of them were doing that?

A. No, just Mr. Mayes was.

Q. So the way Mr. Mayes was questioning you and dealing with you, he made you nervous?

A. Yes, he did.

¶11. At trial, Ousley also said Rainey did not buy her vote:

Q. She didn't give you anything on the day --

A. No, she didn't give me anything.

Q. So she didn't pay you for your vote?

A. No.

Q. She didn't pay you to register?

A. No, she didn't pay me to register.

6

Q. She didn't try to pay you to register?

A. No, she didn't pay, no, she didn't pay me, she didn't give me nothing.

¶12. Ousley testified that on two other occasions, Rainey went to Ousley's workplace, the Holiday Inn, but Ousley was not working on those days. Ousley guessed that Rainey was there to talk to her.

¶13. Ousley said that she knew Rainey was active in the community and had an annual turkey give-away. Ousley attended and saw Rainey, but Rainey did not try to talk to her about the investigation or get her to change her story at that time either.

¶14. Marvin Cain also testified at trial. He said that in March 2017, Rainey came around asking people if they were registered to vote. He told her that he had just moved from Jackson and needed to transfer his registration to Canton. Cain explained that Rainey filled out the form with the answers he gave to the questions. When Rainey offered to buy them a round of beer, Red jumped up and volunteered to go. So Rainey gave Red the money. Cain was emphatic that Rainey did not suggest that they vote for Eric Gilkey as Phelps or Mayes put in the statement that they prepared for Cain to sign during their investigation. Nor did he tell them that Rainey gave each of them (Cain and Ousley) $10 for registering as is also stated in his written statement. Cain testified that when he signed the statement, he told Mayes and Phelps that the information was incorrect and they said they would re-write it.

¶15. After presenting Ousley and Cain's testimony, the State rested. The circuit court denied Rainey's motion for a directed verdict and instructed Rainey on her right to testify.

7

Rainey decided not to testify and proceeded to present testimony from Briseida Rios Castillo.

¶16.    Castillo is the daughter of a friend of Rainey, and Castillo would help Rainey register legal Hispanics to vote. Castillo accompanied Rainey to the apartments in March 2017. The exact date, March 27, was confirmed when Castillo identified the registration form of an Hispanic lady she assisted. Castillo said their sole purpose was to register voters, not to campaign for any candidate. Castillo testified that Rainey was with her the whole time that day and that they were registering people by her car. After Castillo testified, Rainey rested her case.

¶17.    The circuit court instructed the jury, and after counsel presented closing arguments, the jury retired to deliberate. During that time, they sent out two questions:

> Is there a difference between "procure or influence the vote," and "procure or influence the right to vote?"

> Count 1 states "on or about March 27th," would this include the alleged $10 payment made mention for vote?

Without objection by the parties, the circuit court responded:

> The jury has received all of the evidence and all of the instructions. Please continue in your deliberations.

Thereafter, the jury sent another note:

> The jury cannot reach a decision on Count 1. We have reached a decision on Count 2.

The circuit court polled the jury and asked each if further deliberations on Count I would be helpful. All responded in the negative. The circuit court decided against giving a "*Sharplin*"

instruction [3] and asked the jury to return the verdict it was able to reach. The jury did so and found Rainey guilty of Count II. The court declared a mistrial on Count I.

¶18. On September 23, 2019, the circuit court convened Rainey's sentencing hearing. The State asked for the maximum penalty for her conviction of witness intimidation, which is a Class I felony (no more than fifteen years and a maximum fine of $5,000).[4] Rainey submitted numerous letters from community leaders vouching for her background[5] and character.[6] Rainey's attorney pointed out that the State offered misdemeanor pleas to other individuals similarly charged. Others received pre-trial diversion and even those who

---

[3] In this instruction, the court says, "I know that it is possible for honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this case, then you should do so." *Sharplin v. State*, 330 So. 2d 591, 596 (Miss. 1976).

[4] Mississippi Code Annotated section 97-9-129 (Rev. 2020) provides:

   (1) A person who has been convicted of any Class 1 felony under this article shall be sentenced to imprisonment for a term of not more than fifteen (15) years or fined not more than Five Thousand Dollars ($5,000.00), or both.

[5] Rainey grew up in public housing in Canton. She graduated from Canton public schools and from Delta State University. She obtained a master's degree from Jackson State University.

[6] According to Ollie Linson, Rainey is the single mother of a nine-year-old daughter, and she is an asset to her sisters, her mother, and to the community as a whole. According to Cherry Deddens, Rainey's work on the Canton School Board has made it more responsive to the needs of the district. Constable Johnny Sims has never known Rainey to break any laws and said that she has worked tirelessly in the community. Alderwoman Daphne Sims vouched for Rainey's fine work as Canton's Human Cultural Needs director.

pleaded guilty to felony charges did not spend any time in jail.[7] Yet the State's only pre-trial

offer was sixteen years in jail. Her attorney also raised a concern that the statute as applied

in the facts of this case violated Rainey's First Amendment free-speech rights if she could

not contact someone who had lied about her and, without threats or intimidation, tell them

to tell the truth.

¶19.    The circuit court commented that others charged had accepted responsibility and none

were charged with witness intimidation. The court further said that Rainey's case was not

_____

[7] Specifically, Rainey pointed out in her later-filed "Motion for Bond Pending Appeal" the following:

A.  Andrew Grant pleaded guilty to one count of conspiracy to commit vote fraud, and the court sentenced Mr. Grant to five years imprisonment with all five years suspended and a fine. The Court dismissed all of Mr. Grant's remaining indictments and charges, including certain uncharged conduct;

B.  Vickie McNeil's case is still pending but is not likely to proceed to trial due to her extreme infirmity;

C.  Donnell Robinson, indicted on multiple vote fraud counts as a habitual offender, was permitted to plead to a misdemeanor, was not sentenced to jail time, and was ordered to pay a fine;

D.  Valerie Smith plead guilty to a vote fraud felony and was given five years imprisonment with all five years suspended;

E.  Jennifer Robinson's charges were dismissed;

F.  Sherman Mattock's charges were dismissed;

G.  Cary Johnson's charges were dismissed; and

H.  Desmand King's charges were dismissed.

so much about "intimidation" but more about "influence." The court said:

> Additionally, this Court had Andrew Grant stand in front of it and say, I acted with Courtney Rainey in a manner to attempt to commit voter fraud. As far as the nature of the crime, there's nothing that strikes at the heart of the system more than people with influence using that influence to help themselves.
>
> Now, I understand that the claim by the defense is all Ms. Rainey did was go back and tell a witness she better go tell the truth. The problem the Court has with that is the grand jury process is supposed to be secret. Indictments weren't even handed down at this point.
>
> The defense made an argument in opening statements that really struck the Court. The defense talked about there are only so many seats of power and money in this community, and what the Court is struck by is Ms. Rainey sits in every one of those seats, at the intersection of each and every seat of power in this community. And that's what this case comes down to. . . .
>
> For too long in this community, people believed they can take care of criminal matters by going outside the system, by going and talking to people, whether that be violence, threats, influence, persuasion, and that's got to come to a stop. So the Court has to send a message today. You can't attempt to influence the witness of others, the testimony of others.

¶20. After further comments, the circuit court sentenced Rainey to fifteen years with the last three years suspended, and five years' probation along with $698.50 in court costs and fees. The "Judgment of Conviction and Sentence Instanter" was signed on September 23, 2019, and filed on September 24, 2019.

¶21. Thereafter, Rainey filed a "Motion for Bail Pending Appeal," which the circuit court denied, saying:

> The Court is of the opinion that witness intimidation or influencing a witness strikes at the heart of the criminal justice system. The undisputed fact that Defendant approached a witness she believed gave a statement contrary to her and attempted to get that witness to change her statement weighs heavily

11

against the grant of bail.

And this Court cannot ignore that every witness against the Defendant in the witness intimidation case were victims of a shooting into their residence on the eve of trial. Another witness, Chip Matthews, who testified during jury selection regarding a potential juror, also became the victim of a shooting into his residence after his testimony.[8] While there is not a current institution of criminal proceedings for these shootings against the Defendant or anyone connected with Defendant, the Court cannot eradicate this information from its decision in whether Defendant may constitute a special danger to any other person or the community.

¶22. On October 4, 2019, Rainey filed a "Motion to Set Aside Verdict, or in the Alternative, For a New Trial." She argued (1) that as applied to her, the statute under which she was convicted unconstitutionally deprived her of her right to free speech; (2) that the evidence presented was insufficient to support a conviction; and (3) that the sentence imposed upon her was grossly disproportionate to her crime compared to the sentences of others. In her motion, Rainey pointed out:

Furthermore, this Court spoke of things that were simply not true when sentencing Courtney Rainey. For example, this Court based its sentence, in-part, on the fact that Alderman Grant said he conspired with Courtney Rainey, a charge Ms. Rainey was acquitted of all together. But Alderman Grant never said any such thing. The conduct Alderman Grant described was not factually sufficient to support a conspiracy conviction. He expressly stated that there was never an agreement to do anything.

On October 11, 2019, without opinion, the circuit court denied Rainey's motion.

---

[8] After the voir dire, during challenges for cause, the State called Charles Matthews to testify. Matthews had observed a potential juror take off his "juror" sticker and approach Rainey's attorneys. There is nothing in the record concerning Matthews being the victim of a shooting thereafter or that the shooting was related to Matthews's testimony or to Rainey.

12

¶23.   On October 25, 2019, Rainey filed her notice of appeal.  She raises three issues: (1) whether the conviction for witness intimidation in violation of Mississippi Code Annotated section 97-9-113 violated her First Amendment right to free speech; (2) whether the State presented sufficient evidence to support Rainey's violation of section 97-9-113(d); and (3) whether the circuit court's sentence of the maximum imprisonment violated Rainey's Eighth Amendment right.

**Discussion**

¶24.   As noted above, the jury could not reach a verdict on Count I, the voter fraud charge. Rainey's appeal, and our review, is limited to the facts relevant to Rainey's conviction and sentence for telling a witness to give false statements in violation of the witness-intimidation statute.  Accordingly, any alleged exchange of money, i.e., the $10 paid for beer on the day of voter registration and the $10 paid for lunch on the day of voting, is irrelevant to the appeal before us.  Our focus is on the facts relating to Rainey's interactions with Ousley after the district attorney's investigation had begun one year later and that involved no alleged exchange of money.

I.      **Did Rainey's conviction under the witness intimidation statute violate her First Amendment right to free speech?**

¶25.   The statute under which Rainey was convicted reads in relevant part:

(1) A person commits the crime of intimidating a witness if he intentionally or knowingly:

      (a) Attempts, by use of a threat directed to a witness . . . to:
          (i) Influence the testimony of that person;

13

. . . .

(b) Harasses or intimidates or attempts to threaten, harass or intimidate a witness or a person reasonably expected to be a witness;[or]

. . . .

(d) Solicits, encourages or requests a witness to provide false information intended to defeat or defend against an existing criminal charge or to hinder or interfere an ongoing investigation of a criminal act.

Miss. Code Ann. § 97-9-113.

¶26. "This Court applies de novo review to the issue of the constitutionality of a statute or ordinance. We bear in mind (1) the strong presumption of constitutionality; (2) the challenging party's burden to prove the statute is unconstitutional beyond a reasonable doubt; and (3) all doubts are resolved in favor of a statute's validity." *Crook v. City of Madison*, 168 So. 3d 930, 935 (¶14) (Miss. 2015) (citing *Johnson v. Sysco Food Servs.*, 86 So. 3d 242, 243 (¶3) (Miss. 2012)).

¶27. "A plaintiff can only succeed in a facial challenge [to the constitutionality of a statute] by establishing that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). "Facial challenges to a statute based on First Amendment grounds generally implicate the 'overbreadth doctrine,'" namely that a statute is overbroad if it "sweeps within its ambit other activities protected by the First Amendment." *Wilcher v. State*, 227 So. 3d 890, 895 (¶26) (Miss. 2017).

14

Mississippi Code Annotated section 97-9-127 (Rev. 2014) makes it a crime to intentionally or knowingly harm an individual in retaliation for something lawfully done by that individual who was acting in his capacity as a public servant. *Wilcher*, 227 So. 3d at 894 (¶19). Wilcher was charged with violation of this statute when she falsely accused Sheriff's Deputy Townsend of raping her during an arrest. *Id.* at 893 (¶13). On appeal of her conviction, she challenged the statute, alleging, among other things, that it was vague, *id.* at 894 (¶21), and that her accusation was protected speech. *Id.* at 895 (¶23). However, Wilcher cited no legal authority to support how the statute infringed upon her First Amendment rights. *Id.* at (¶24). Considering her vagueness argument in light of the First Amendment, the court recognized that a statute could be "unconstitutionally overbroad if it does not aim specifically at evils within the allowable area of State control, but, on the contrary sweeps within its ambit other activities protected by the First Amendment." *Id.* at 895 (¶26). But

> [t]his Court will not strike down a statute on constitutional grounds unless it appears beyond all reasonable doubt the statute violates the Constitution. The party challenging the statute's constitutionality bears the burden of proving its unconstitutionality.

*Id.* at 895-96 (¶28) (citations omitted). Examining the wording in the statute, the *Wilcher* court said that "each word and phrase that comprises it is readily understandable to any reasonable person of ordinary intelligence." *Id.* at 896 (¶12).

¶28. Similarly, in the case at hand, Rainey fails to present authority to show that section 97-9-113 infringes upon her right to free speech. The statute clearly and specifically prohibits threats, harassment, intimidation, and influence of a witness—terms readily understandable

15

by ordinary persons. Rainey agrees that "threats" are not protected by the First Amendment, *Virginia v. Black*, 538 U.S. 343, 359 (2003), and makes no challenge the use of the words "intimidation" or "harassment" as being unconstitutionally vague.

¶29.    Rainey herself agrees that she has no facial constitutional challenge to the statute in question.   Instead she says hers is an "as applied challenge" to the statute, saying that "applying [section] 97-9-113(d) to the facts the State put forth at trial, this Court should overturn her conviction as unconstitutional under both the United States and Mississippi Constitutions."   A plaintiff generally cannot prevail on an "as-applied" challenge without showing that the law has in fact been, or is sufficiently likely to be, unconstitutionally applied to him.  *McCullen v. Coakley*, 573 U.S. 464, 509 n.5 (2014).  For example, in *Boddie v. Connecticut*, 401 U.S. 371, 380 (1971), the Supreme Court found a Connecticut statute that required payment of court fees and costs to obtain a divorce was unconstitutional as applied to a class of welfare recipients who were unable to pay the required fees.  The Court held:

> [W]e conclude that the State's refusal to admit these appellants to its courts, the sole means in Connecticut for obtaining a divorce, must be regarded as the equivalent of denying them an opportunity to be heard upon their claimed right to a dissolution of their marriages, and, in the absence of a sufficient countervailing justification for the State's action, a denial of due process.

*Id*. at 380-81.

¶30.    Rainey claims the witness intimidation statute, as applied to her, infringes on her right to free speech.  But not all speech is protected.  "Many acts which involve only speech can be criminalized: extortion, bribery, witness intimidation, perjury.  The fact that Defendant's

16

acts were speech acts does not bring them within the protection of the First Amendment."

*United States v. Edwards*, No. 2:17-CR-170, 2020 WL 2465006, at \*3 (S.D. Ohio May 13, 2020). In this case, Rainey cites no precedent or authority with facts similar to hers that holds that talking to a witness about a criminal investigation constitutes deprivation of free speech.

¶31. Rainey argues repeatedly that her conversations with Ousley did not constitute a "true threat" that would be prosecutable speech, citing *United States v. Colhoff*, 833 F.3d 980, 982-83 (8th Cir. 2016). Admittedly *Colhoff* is not applicable to Rainey's facts. There, the appellate court was examining a federal statute, 18 U.S.C. § 1512(b)(1), which required the government to show that Colhoff knowingly attempted to "use intimidation, threaten, or corruptly persuade another person" with the intent to "influence, delay, or prevent" testimony in an official proceeding. *Id*. at 984. The statute specifically prohibited threats to a witness.[9]

¶32. *Colhoff* is inapplicable to the case at hand because Mississippi's witness intimidation statute is broader than the federal statute considered in *Colhoff*. Our intimidation statute covers more than threatening conduct, and in essence, Rainey's constitutional argument is merely an argument that her post-investigation contact with Ousley did not violate the statute. But whether Rainey's conversation was innocent speech or whether it constituted harassment,

---

[9] Colhoff claimed that his telling a witness that "snitches get stitches" was merely a "political rant" protected by the First Amendment and not a "true threat," but the court found that Colhoff's statement could cause a reasonable person to fear bodily harm and rejected Colhoff's First Amendment challenge. *Colhoff*, 833 F.3d at 984.

intimidation, or an attempt to influence Ousley to make false statements, which is also covered by the statute, was a factual question for the jury to decide. Because Rainey's speech in this instance could constitute prosecutable speech under Mississippi's statute, we cannot hold the statute unconstitutional as applied to her facts. Accordingly, we do not find that Mississippi Code Annotated section 97-9-113 as applied to her facts violated Rainey's First Amendment free-speech right.

## II. Was evidence sufficient to convict Rainey of violation of section 97-9-113?

¶33. When considering a sufficiency of evidence argument, "[t]he critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed." *O'Donnell v. State*, 173 So. 3d 907, 916 (¶20) (Miss. Ct. App. 2015) (internal quotation marks omitted). "[T]his Court will reverse and render only if the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty." *Manning v. State*, 269 So. 3d 216, 220 (¶17) (Miss. Ct. App. 2018) (citing *Hughes v. State*, 983 So. 2d 270, 275-76 (¶10) (Miss. 2008)). The evidence and all inferences that could be drawn from it are considered in the light most favorable to the State. *Id.* We proceed, then, to examine if the evidence presented proved each element of the charges against Rainey and was sufficient to sustain a guilty verdict.

¶34. As previously noted, section 97-9-113 prohibits three types of behavior: (1)

18

threatening a witness to influence his testimony; (2) harassing or intimidating a potential witness; and (3) soliciting, encouraging, or requesting a witness to give false testimony.

¶35.    In this case, the Jury Instruction on Count II of Rainey's charges read:

JURY INSTRUCTION 8

The Court instructs the jury that Courtney L. Rainey has been charged with the crime of Intimidating a Witness in Count II of the Indictment. If you find from the evidence in this case beyond a reasonable doubt that:

**COUNT II**

1. Based upon a series of acts connected together and constituting parts of a common scheme and plan that the Defendant, Courtney L. Rainey, on or about and between August 1, 2017 through August 17, 2018 in Madison County, Mississippi;

2. Did intentionally and knowingly attempt to solicit, encourage or request a witness to provide false information;

3. Intended to defeat or defend against an existing criminal charge; or

4. Intended to hinder or interfere in an ongoing investigation of a criminal act, particularly the Voter Fraud allegation contained in Count I of the Indictment;

5. By going to the home of witness, Emma Ousley, and requesting her to change her story that she had given to investigators so that the Defendant, Courtney L. Rainey, would not get in trouble;

then you shall find the Defendant, Courtney L. Rainey, guilty of Intimidating a Witness, as charged in Count II of the Indictment.

If the State has failed to prove any one or more of the above-listed elements beyond a reasonable doubt, then you shall find the Defendant, Courtney L. Rainey, not guilty of Intimidating a Witness, as charged in Count

19

II of the Indictment.[10]

Although the instruction itself does not faithfully track the language of the statute, it appears to instruct the jury that Rainey is charged with the third type of prohibited behavior, i.e., encouraging a witness to give false testimony.[11]

¶36.    The only proof on this count presented by the State was testimony from Ousley. The State argues that Ousley testified that Rainey suggested that she should not mention the money Rainey had given her or actually tell investigators that she had not received any money. But in her actual testimony, Ousley did not say this. Only twice did Ousley give the specifics of her conversation with Rainey about the investigation and what Rainey said. On direct examination, Ousley said Rainey came to her apartment and asked her questions about it.

    Q.    What were those questions about?

    A.    Did she give me ten dollars, or what did I say, Twin, is it true. I told her, I said I was just going to tell the truth. I walked her down to the car, and I told her, I said, I'm just going to tell the truth. And she got in her car and went home, or wherever she went. I don't know where she went.

On cross-examination, the following exchange occurred:

    Q.    . . . What did she tell you to say?

--------

[10] This elements instruction was proposed by the State. Rainey did not object to it and withdrew her proposed elements instruction.

[11] Even the dissents agree that Rainey was not charged with, and the State did not have to prove, that Rainey intimidated Ousley.

A.      She didn't tell me to say anything.

Q.      She told you to tell them folks the truth?

A.      Yes.

Q.      So her intimidating you was to tell you to tell the police the truth?

A.      Yes.  And it wasn't no intimidation. She didn't intimidate me. She didn't intimidate me at all.

Q.      And you don't get the feeling that she was trying --

A .     -- no, she didn't intimidate me. I'm not going to -- see, you say like intimidate me. It was no kind of intimidation at all.

Q.      Okay. So she was just telling you to tell folks the truth?

A.      Yeah, just tell the truth.

¶37.    Nowhere in her testimony did Ousley say that Rainey had told her to lie about the money Rainey had given her as the State argues.  Ousley testified about the investigators coming (Mayes and Goodman) and the written statement that they had her to sign.  In that written statement, Ousley said that Rainey had come to the apartments asking people if they wanted to make some money.  On the witness stand Ousley said that this was not true.  In that written statement, Ousley also said that Rainey gave both her and Cain $10 each, which was also not true.  Ousley then went on to say that after she had given this written statement, Rainey came to her apartment and asked Ousley what she had told the investigators about the money and was it true.  Thereafter, Ousley told Rainey that she would tell the truth.

¶38.    On cross examination, the inaccuracy of Ousley's written statement again was

21

raised. Ousley turned to the jury and admitted that the statement she gave contained material lies. Apparently Rainey learned about the investigation, and approached Ousley. Ousley said Rainey specifically told her to tell the truth—Rainey did not tell her what to say; she only told her to tell the truth.[12] If Rainey was trying to get Ousley to "change her story,"[13] it was only to change it from the lies contained in her written statement to the truth. Without direct testimony that Rainey told Ousley to give false statements or evidence of the false statements Rainey allegedly instructed Ousley to give, there is no proof in the record of a key element of the crime charged and the jury's conviction of witness tampering by inducing a witness to give a false statement is unsupported. Ousley's testimony that she "figured" Rainey wanted her to change her story was itself speculation. To conclude from Ousley's speculation that the reason for Rainey's visit was to instruct Ousley to give false statements is not an "inference" as the dissents advance, but rather further speculation on our part.

_____

[12] Judge Wilson's dissent charges the majority with "assuming that Rainey had learned all of the details of Ousley's statement and confronted Ousley only to urge her to correct specific misstatements. . . . " But we make no assumptions; we merely state the facts proven in the record; namely that after the investigators had spoken to Ousley, Rainey approached Ousley and told her to the truth. In fact, it is Judge Wilson who makes ungrounded assumptions when he says that a jury could infer "that Rainey (a) knew that Ousley had told investigators that Rainey had given her money in connection with her registration application and/or absentee vote and (b) confronted Ousley to get her to recant her statement in its entirety," despite the lack of evidence on what Rainey knew and despite Ousley's repeated testimony that Rainey only told her to tell the truth.

[13] When attempting to impeach Ousley as to where she and Rainey were when they spoke—whether at Ousley's apartment or at her job—defense counsel inartfully used the term "change your story." Ousley never used that term but repeatedly said Rainey told her to tell the truth.

¶39.    Although the State also argues that the statute itself says that failure to intimidate or threaten a witness is no defense, citing section 97-9-113(3), Rainey was not charged with intimidating or threatening Ousley, making the State's argument meaningless.  The State chose to prosecute Rainey for instructing Ousley to give false statements to investigators, not for threatening or intimidating Ousley.  Moreover, there is no proof in the record of threats or intimidation by Rainey.

¶40.    With no proof of intimidation, threats, harassment, or proof that Rainey instructed Ousley to give false statements, the verdict of the jury must be overturned.  The proof in this case is not like that presented by the State in another witness intimidation case, *Manning v. State*.  There, Natalla Carter was in Christopher Houston's home when he was shot and killed.  *Manning*, 269 So. 3d at 218 (¶3).  Hearing the shot, Carter ran outside and found Houston.  *Id*.  In his dying breath, Houston identified Manning as the shooter.  *Id.* Carter reported this to law enforcement and became a key witness in the State's case against Manning.  *Id.* at (¶4).  Later, Carter encountered Manning on two occasions: once at her mother's apartment complex where Manning made kissing gestures to her and another time when he came near and she heard him say something about "doing something." *Id.* at 221 (¶19).  Carter was frightened enough by these encounters to press charges against Manning. *Id*. at 219 (¶8).  We held that the testimony of the single witness, Carter, to the threats and fear she experienced, was sufficient to support a conviction, citing *Cousar v. State*, 855 So. 2d 993, 998-99 (¶16) (Miss. 2003).

¶41.    But here the one witness against Rainey was Ousley who in her sworn testimony to

23

the jury said that Rainey did not threaten or intimidate her. Nor did Rainey pressure her to give false testimony. To reiterate, Ousley repeatedly testified that Rainey told her to tell the truth. In his dissent, Judge Wilson asserts that we have overstepped our bounds in our review. He quotes *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010), "We are not required to decide—and in fact we must refrain from deciding whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." But immediately thereafter, the supreme court in *Poole* says, "If, *on any element of the crime*, it is impossible to say that a reasonable person could have found that the State proved *that element*, then we must reverse and render." *Id.* (emphasis added). In this case, there is simply no credible evidence that Rainey told Ousley to give false statements in the investigation, which was a key element of the crime charged. This is one of those "exceptional cases" referred to in *Weatherspoon v. State*, 56 So. 3d 559, 564 (¶20) (Miss. 2011), where "the evidence preponderates heavily against the verdict." Given the proof in this record, reasonable men could not have found her guilty of witness intimidation beyond a reasonable doubt.[14] Accordingly, we reverse and render in favor of Rainey.[15]

---

[14] Judge Wilson also asserts that we have improperly viewed the evidence in the light most favorable to Rainey, instead of the State. He misconstrues our threshold examination of the record for proof of the elements of the crime, which we must undertake before examining any reasonable inferences that can be drawn from it. Here the record lacks proof on the element that Rainey instructed Ousley to give false statements, so no inferences, one way or another, can be drawn.

[15] We are not determining that Rainey was innocent as Judge Wilson says; rather we are determining that the State did not meet its burden of proving her guilty.

¶42.    Because we reverse and render in favor of Rainey, we need not deal with the issue of the legality of her sentence.

## Conclusion

¶43.    Although there was no merit to Rainey's free-speech claim, because there was insufficient evidence to support her conviction of witness intimidation, we reverse and render a judgment of acquittal.

¶44.    **REVERSED AND RENDERED.**

**BARNES, C.J., WESTBROOKS AND McCARTY, JJ., CONCUR. LAWRENCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., WESTBROOKS, McDONALD AND McCARTY, JJ. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON, P.J., GREENLEE AND SMITH, JJ.  WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., GREENLEE AND SMITH, JJ.  EMFINGER, J., NOT PARTICIPATING.**

**LAWRENCE, J., SPECIALLY CONCURRING:**

¶45.    I concur with the majority's decision to reverse and render the circuit court's judgment based on insufficient evidence to convict Rainey under Count II pursuant to Mississippi Code Annotated section 97-9-113(d) (Rev. 2020).  I write separately to elaborate on how the State failed to meet its burden of proof on each of the elements of the crime alleged in Count II of the indictment.

¶46.    On November 20, 2018, a Madison County grand jury returned a two-count indictment against Rainey for voter fraud (Count I) and intimidating a witness (Count II). At trial, the jury was unable to reach a verdict on Count I but found Rainey guilty of Count

25

II.[16]   Count II of Rainey's indictment specifically charged that Rainey

> did intentionally and knowingly attempt to **solicit, encourage or request** a witness to **provide false information** intended to **defeat or defend against an existing criminal charge** or to **hinder or interfere an ongoing investigation** of criminal act, to-wit: Emma Ousley (a witness to a crime purportedly committed by Defendant) at her home at the Canton Place Apartments, **by requesting Ms. Ousley to change her story that she provided to investigators** so the defendant would not get in trouble[.]

(Emphasis added).  At trial, the State had the burden of proving each and every essential element of the offense charged **beyond a reasonable doubt**.  *Mangum v. State*, 762 So. 2d 337, 341 (¶11) (Miss. 2000).  While there are several potential ways to violate Mississippi Code Annotated section 97-9-113, in this case, the State chose to allege that Rainey solicited or encouraged Ousley to **provide false information**.  The State is bound by the crime indicted and the language utilized within the indictment.[17]  *Hall v. State*, 127 So. 3d 202, 207 (¶17) (Miss. 2013); *Martin v. State*, 501 So. 2d 1124, 1128 (Miss. 1987); *Talley v. State*, 174 Miss. 349, 167 So. 771, 771-72 (1935).  Yet a review of Ousley's actual testimony at trial provides little support for the allegations in the indictment, much less proof beyond a reasonable doubt.

¶47.   The State called Emma Ousley as its sole witness to testify regarding the essential

---

[16] Because the jury could not reach a verdict on Count I of the indictment, I limit my comments regarding the sufficiency of the evidence to Count II.

[17] The State moved to amend Rainey's indictment as to Count I prior to trial. However, the State never filed a motion to strike surplusage or a motion to amend the indictment as to Count II either prior to trial or during trial to conform to the evidence presented.

26

elements described in Count II of Rainey's indictment. Notably, during direct examination the State never asked Ousley to describe what "false information" that Rainey allegedly asked her to provide or how Rainey asked her to "change her story" from what she initially provided to investigators so that "Rainey would not get in trouble." In fact, those words were never uttered by the witness. Further, the State never proffered any question concerning whether Rainey's alleged request to Ousley was done during an investigation or to hinder an investigation. On cross-examination, Ousley testified that Rainey came to her house to ask questions about the investigation and told Ousley to "tell the truth." Ousley was asked multiple times throughout her cross-examination, "[W]hat did [Rainey] tell you to say?" Ousley stated, "She didn't tell me to say anything" but "just tell the truth." When asked, "[D]idn't you say [Rainey] came to your job and tried to get you to change your story?" Ousley stated, "**I wasn't there but I figured that's what she wanted me to do**."[18] (Emphasis added). Ousley's testimony regarding Rainey's reason for visiting her workplace is completely speculative because the one encounter between Ousley and Rainey never happened at her workplace. Their only encounter took place at Ousley's house. Further, the indictment alleged that the State would prove that Rainey requested Ousley "to change her story that she provided to investigators so the defendant would not get in trouble." There was absolutely zero testimony as to that allegation in the indictment.

---

[18] It is obvious that there was only one meeting between Ousley and Rainey and that on that occasion Rainey told Ousley to tell the truth. The victim's "I figured" testimony is not only speculative but also wholly insufficient as proof beyond a reasonable doubt.

¶48.    Ousley's statement that Rainey told her to "tell the truth" in and of itself is not sufficient evidence that reasonable men could have found, beyond a reasonable doubt, that Rainey was guilty of soliciting, encouraging, or requesting Ousley to **provide false information**.  Ousley's testimony was clear that she initially lied to the investigators on several points because she was nervous, and she told the State a week before trial about the incorrect information in the police report.  In addition, Ousley, clarified her testimony that when she said she changed her story, she did so to tell the truth because her initial statement in the police report was incorrect on several points.

¶49.    An indictment is a critical step in the criminal justice process and serves as notice of what the State is alleging the defendant did wrong.  It outlines what the State must prove according to the facts of the case and the law under which the defendant was indicted.  The State never proved beyond a reasonable doubt the following essential elements listed within the indictment:

- that Rainey solicited, encouraged, or requested a witness

- to provide false information,

- intended to defeat or defend against an existing criminal investigation or to hinder or interfere an ongoing investigation of a criminal act, and

- that Ousley "changed her story that she provided to investigators so the defendant would not get in trouble."

Ousley testified the only reason she changed her story was to "tell the truth" and to correct what was incorrectly stated in the police report.  That is hardly a sufficient basis to convict

28

Rainey of soliciting a witness to provide false testimony. It is axiomatic that a trial is a search for the truth.[19] Ousley testified under oath that she was correcting information she had previously given to the police. She admitted under oath that Rainey told her to "tell the truth" at trial. How can Rainey be convicted of procuring false testimony when Ousley herself said the testimony was truthful?

**BARNES, C.J., WESTBROOKS, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**

**CARLTON, P.J., DISSENTING:**

¶50. I respectfully dissent from the majority's finding that insufficient evidence existed to support the jury's verdict finding Rainey guilty of witness intimidation. In support of its decision, the majority states that the only proof offered by the State in support of Count II was Ousley's testimony. The majority asserts that Ousley's testimony failed to prove that Rainey told Ousley to give false statements to investigators, and as a result, "the jury's conviction of witness tampering by inducing a witness to give a false statement is unsupported." (Maj. Op. at (¶38)). The majority accordingly reverses and renders Rainey's conviction. However, after viewing all of the evidence in the light most favorable to the State, as required when reviewing a challenge to the sufficiency of the evidence, I find that the evidence is sufficient to support the jury's verdict. *See Walker v. State*, 299 So. 3d 759,

---

[19] *Tyson v. State*, 237 Miss. 149, 112 So. 2d 563, 564 (1959); *Sims v. ANR Freight System Inc.*, 77 F.3d 846, 849 (5th Cir.1996); *Jones v. Jones*, 995 So. 2d 706, 711(¶16) (Miss. 2008); *Miss. Comm'n on Judicial Performance v. Osborne*, 11 So. 3d 107, 115 (¶26) (Miss. 2009).

764 (¶16) (Miss. 2020).

¶51. The Mississippi Supreme Court has instructed that "when reviewing challenges to the sufficiency of the evidence" on appeal, the appellate court must "view all evidence in the light most favorable to the State." *Id*. (quoting *Thomas v. State*, 277 So. 3d 532, 535 (¶11) (Miss. 2019)). "Under this standard, 'the State receives the benefit of all favorable inferences that may be reasonably drawn from the evidence.'" *Thomas*, 277 So. 3d at 535 (¶11) (quoting *Hughes v. State*, 983 So. 2d 270, 276 (¶10) (Miss. 2008)). This Court "must affirm if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. (quoting *Cotton v. State*, 144 So. 3d 137, 142 (¶8) (Miss. 2014)). Furthermore, "this Court will reverse and render only if the facts and inferences 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty[.]'" *Walker*, 299 So. 3d at 764 (¶16) (quoting *Hughes*, 983 So. 2d at 275-76 (¶10)).

¶52. The record reflects that Count II of Rainey's indictment charged her with intimidating a witness in violation of Mississippi Code Annotated section 97-9-113(1)(d) (Rev. 2020). Section 97-9-113(1)(d) provides that "[a] person commits the crime of intimidating a witness if he intentionally or knowingly . . . [s]olicits, encourages or requests a witness to provide false information intended to defeat or defend against an existing criminal charge or to hinder or interfere an ongoing investigation of a criminal act."[20] Rainey's indictment specifically

_____

[20] In footnote 11, the majority states, "Even the dissents agree that Rainey was not charged with, and the State did not have to prove, that Rainey intimidated Ousley." (Maj.

charged that Rainey

> intentionally and knowingly attempt[ed] to solicit, encourage or request a
> witness to provide false information intended to defeat or defend against an
> existing criminal charge or to hinder or interfere an ongoing investigation of
> criminal act, to-wit: Emma Ousley (a witness to a crime purportedly committed
> by Defendant) at her home at the Canton Place Apartments, by requesting Ms.
> Ousley to change her story that she provided to investigators so the defendant
> would not get in trouble[.]

¶53. As part of their investigation into potential voter fraud, investigators with the District Attorney's office interviewed Ousley and questioned her about Rainey. Ousley provided a statement to the investigators about Rainey's voter registration visit. Ousley's statement, which was admitted into evidence as exhibit D-1, reflects that she told investigators she filled out the voter registration application after Rainey approached her and asked "if we wanted to make a couple of dollars." However, at trial, Ousley admitted that she was not entirely truthful in her statement to investigators. Ousley testified her statement that Rainey asked her if she wanted to make some money was not true. Ousley explained she only told investigators that Rainey said that because Ousley was nervous. Ousley also admitted that

---

Op. at n.11). To be clear, this dissent does not agree that Rainey was not charged with intimidating Ousley. The record reflects that intimidating Ousley is exactly what Rainey was charged with: Count II of Rainey's indictment charges her with intimidating a witness in violation of section 97-9-113(1)(d). In fact, the title of section 97-9-113 is "Intimidating a witness." As discussed later in this separate opinion, section 97-9-113(3) clearly states that "[i]t is not a defense to a prosecution under this section if the actual completion of the threat, harassment or intimidation was prevented from occurring." Stated differently, the State did not have to prove that Ousley was actually intimidated by Rainey in order to find Rainey guilty of the charged offense. Further, as discussed below, the jury instruction in this case that set forth the elements of the crime of intimidating a witness tracked the language of the statute and Rainey's indictment.

although she told the investigators that Rainey gave both her and Cain ten dollars, Rainey actually only gave Cain ten dollars.

¶54.    Ousley testified that after she gave her statement to the investigators, Rainey visited her at her home.  According to Ousley, "[Rainey] was asking me a lot of questions" about what she told the investigators.  In its brief, the State asserts Ousley testified that during this time, Rainey "suggested that [Ousley] should not mention that Rainey had given her any money."  However, as the majority acknowledges, "in her actual testimony, Ousley did not say this." (Maj. Op. at (¶36)).  Instead, a review of Ousley's trial testimony regarding Rainey's visit to her home reflects that when the State asked Ousley what Rainey asked her, Ousley answered, "Did she give me ten dollars, or what did I say, . . . is it true."  Ousley testified that in response to Rainey's questions, she told Rainey that "I was just going to tell the truth.  I walked her down to the car, and I told her, I said, I'm just going to tell the truth." As to any specific statements Rainey made to Ousley while questioning her about what Ousley told investigators, Ousley testified at trial that Rainey specifically told Ousley to tell the investigators the truth.[21]

_____

[21] During cross-examination, the following exchange occurred:

Q:    What did she tell you to say?

A:    She didn't tell me to say anything.

Q:    She told you to tell [the investigators] the truth?

A:    Yes.

¶55. Ousley testified that after Rainey came to her home, Rainey also came to see Ousley at the hotel where Ousley worked. Ousley stated that Rainey came by the hotel on two or three different occasions, but Ousley was not there during any of these visits. Ousley stated that Rainey had never come to her workplace before. Ousley testified that she "figured" Rainey came to see her at work to try and get her to change her story given to the investigators. During cross-examination, defense counsel asked, "And how many times did [Rainey] try to tell you to change your story towards you?" Ousley clarified "[o]ne time," referring to the time Rainey approached Ousley at her house.

¶56. Ousley also testified that she was not intimated by Rainey. However, section 97-9-113(3) provides that "[i]t is not a defense to a prosecution under this section if the actual completion of the threat, harassment or intimidation was prevented from occurring." After viewing the evidence in the light most favorable to the State, I find that the jury could infer from the evidence and circumstances that Rainey intimidated Ousley by "intentionally or knowingly . . . solicit[ing], encourag[ing,] or request[ing] . . . [Ousley] to provide false information intended to defeat or defend against an existing criminal charge or to hinder of

Q: So her intimidating you was to tell you to tell the police the truth?

A: Yes. And it wasn't no intimidation. She didn't intimidate me. She didn't intimidate me at all.

. . . .

Q. Okay. So she was just telling you to tell folks the truth?

A: Yeah, just tell the truth.

33

interfere with an ongoing investigation of a criminal act" when Rainey visited Ousley and

questioned her about her statement to investigators.[22] Miss. Code Ann. § 97-9-113(1)(d).

Additionally, a review of the transcript also shows that the defense did not present any

---

[22] The jury instruction that set forth the elements of intimidating a witness tracked the language of section 97-9-113(1)(d) and Rainey's indictment:

The [c]ourt instructs the jury that [Rainey] has been charged with the crime of Intimidating a Witness in Count II of the Indictment. If you find from the evidence in this case beyond a reasonable doubt that:

### COUNT II

1. Based upon a series of acts connected together and constituting parts of a common scheme and plan that [Rainey] on or about and between August 1, 2017 through August 17, 2018 in Madison County, Mississippi;

2. Did intentionally and knowingly attempt to solicit, encourage or request a witness to provide false information;

3. Intended to defeat or defend against an existing criminal charge; or

4. Intended to hinder or interfere in an ongoing investigation of a criminal act, particularly the Voter Fraud allegation contained in Count I of the Indictment;

5. By going to the home of witness, Emma Ousley, and requesting her to change her story that she had given to investigators so that the Defendant, Courtney L. Rainey, would not get in trouble;

then you shall find the Defendant, Courtney L. Rainey, guilty of Intimidating a Witness, as charged in Count II of the Indictment.

If the State has failed to prove any one or more of the above-listed elements beyond a reasonable doubt, then you shall find the Defendant, Courtney L. Rainey, not guilty of Intimidating a Witness, as charged in Count II of the Indictment.

34

evidence or testimony to contradict Ousley's statements that Rainey visited her at work and that Ousley figured Rainey only visited her because she wanted Ousley to change her story to the investigators. Furthermore, I disagree with the majority's finding that the facts and inferences so point in favor of Rainey that "reasonable men could not have found her guilty of witness intimidation beyond a reasonable doubt." (Maj. Op. at (¶41)). I therefore respectfully dissent from the majority's decision to reverse and render.

**WILSON, P.J., GREENLEE AND SMITH, JJ., JOIN THIS OPINION.**

**WILSON, P.J., DISSENTING:**

¶57. Viewing the evidence in the light most favorable to the jury's verdict, there is sufficient evidence for a rational juror to find Rainey guilty. Therefore, Rainey's conviction and sentence must be affirmed. The majority reverses the conviction only by improperly viewing the evidence in the light most favorable to Rainey. I respectfully dissent.

¶58. To find Rainey guilty of "the crime of intimidating a witness," the jury had to find that Rainey "intentionally or knowingly . . . [s]olicit[ed], encourage[d] or request[ed] [Ousley] to provide false information intended to defeat or defend against an existing criminal charge or to hinder or interfere an ongoing investigation of a criminal act." Miss. Code Ann. § 97-9-113(1)(d) (Rev. 2020). The State was not required to prove that Rainey intended to intimidate Ousley or actually intimidated Ousley but only that Rainey asked or encouraged Ousley "to provide false information." *Id.*

¶59. Ousley testified at trial that Rainey gave her and Cain ten dollars for beer after she

35

helped them complete a voter registration application. Ousley originally told investigators that Rainey gave her and Cain ten dollars each, but at trial she testified that Rainey gave them a total of ten dollars. Ousley also testified at trial that Rainey later drove her to City Hall to vote by absentee ballot and afterward gave her an additional ten dollars. Ousley had not mentioned this second payment to the investigators.

¶60.     When Rainey later learned that Ousley had talked to the investigators, she showed up at Ousley's house. Ousley testified that Rainey had never visited her house on any other occasion. According to Ousley, Rainey asked her "a lot of questions" about what she had told the investigators and wanted to know whether she had told the investigators that Rainey had given her ten dollars. On cross-examination, defense counsel asked Ousley, "[H]ow many times did [Rainey] try to tell you to change your story . . . ?" Ousley answered, "One time"—when Rainey confronted her "at [her] house."[23]

¶61.     The majority finds that Rainey is innocent by reasoning that "[i]f Rainey was trying to get Ousley to 'change her story,' it was only to change it from the lies contained in her written statement to the truth." *Ante* at ¶38 (footnote omitted). This improperly views the evidence in the light most favorable to Rainey. The jury was not required to accept this innocent explanation, and in a challenge to the sufficiency of the evidence, this Court must view the evidence in the light most favorable to *the State*, not Rainey. *Poole v. State*, 46 So.

_____

[23] On two other occasions, Rainey showed up at Ousley's place of work looking for her, but Ousley was not at work on those days. Ousley testified that Rainey had never come to her place of work before.

3d 290, 293 (¶20) (Miss. 2010). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* at 293-94 (¶20).

¶62. The majority seems to assume and accept as fact that Rainey (a) had learned all the details of Ousley's statement to the investigators and (b) confronted Ousley only to urge her to correct specific misstatements—e.g., that Rainey gave Ousley and Cain ten dollars *total*, not ten dollars *each*, when she helped them complete voter registration applications. *See ante* at ¶¶37-38. The jury was not *required* to accept this innocent explanation of Rainey's visit. Rather, there was sufficient evidence for the jury to infer that Rainey (a) knew Ousley had told investigators that Rainey had given her money in connection with her registration application and/or absentee vote and (b) confronted Ousley to get her to recant her statement in its entirety. Thus, the jury reasonably could have found Rainey guilty of asking or encouraging Ousley "to provide false information" in order to hinder the ongoing criminal investigation. Miss. Code Ann. § 97-9-113(1)(d). Accordingly, Rainey's conviction should be affirmed.

**CARLTON, P.J., GREENLEE AND SMITH, JJ., JOIN THIS OPINION.**